### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

ANTHONY DADABO,

       Petitioner,

v.                                                          Case No. 8:15-cv-2250-T-33TGW

SECRETARY, DEPARTMENT
OF CORRECTIONS,

       Respondent.

_____/

### <u>ORDER</u>

Petitioner Anthony Dadabo, an inmate in the Florida Department of Corrections proceeding *pro se*, filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.)  He challenges his conviction entered by the Circuit Court for the Sixth Judicial Circuit, in and for Pinellas County, Florida, in 2009.  Respondent filed a response (Doc. 8), in which it agrees that the petition is timely.  Dadabo filed a reply.  (Doc. 11.)  Upon review, the petition must be denied.

### PROCEDURAL HISTORY

A jury convicted Dadabo of one count of first degree murder.  (Doc. 10, Ex. 18, Vol. I, p. 121.)  He was sentenced to life imprisonment. (*Id.*, pp. 122-25.)  The state appellate court *per curiam* affirmed his conviction and sentence.  (Doc. 10, Ex. 4.)  Dadabo's motion for postconviction relief filed under Florida Rule of Criminal Procedure 3.850 was summarily denied.  (Doc. 10, Exs. 6, 7, 10.)  The state appellate court *per curiam* affirmed the order of denial.  (Doc. 10, Ex. 14.)

## FACTS

The postconviction court summarized the facts of the case:

The Defendant and co-defendant Joseph Difiori were individually charged by indictment with one count of murder in the first degree, a capital felony, for the beating and stabbing death of the Defendant's friend Mary Ditt[ ]us at her home during the course of a robbery. The evidence at the Defendant's trial showed that the co-defendant and Defendant planned to rob the victim. The Defendant drove the victim to a casino and later when he went to pick her up, he telephoned the co-defendant to let him know the coast was clear to hide in the victim's home and await their return. When the Defendant and the victim entered the home the Defendant made an excuse to go into the office where he knew the co-defendant was waiting. The co-defendant hit the victim numerous times with a hammer causing mortal wounds but before she died she was stabbed many times with two different knives. The Defendant used the money taken from the victim to purchase crack cocaine which was consumed by the Defendant and co-defendant. Several days later the Defendant went to the victim's home on the premise that he had not heard from her in a couple of days and "discovered" the body.

The Defendant moved back to upstate New York but he was eventually linked to the victim's murder and he confessed after questioning from detectives from the Pinellas County Sheriff's Office to again interview the Defendant.

(Doc. 10, Ex. 7, pp. 29-30.)

## STANDARD OF REVIEW

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding. *Wilcox v. Florida Dep't of Corr.,* 158 F.3d 1209, 1210 (11th Cir. 1998), *cert. denied,* 531 U.S. 840 (2000). Habeas relief can only be granted if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d), which sets forth a highly deferential standard for federal court review of a state court adjudication, states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000), the Supreme Court interpreted this deferential standard:

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied–the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal Law, as determined by the Supreme Court of the United States" or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.   Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 562 U.S. 86, 103 (2011). *Accord Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that [the federal court is] to decide.").  The

phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

The purpose of federal review is not to re-try the case.  "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Cone*, 535 U.S. at 693.  In other words, "AEDPA prevents defendants–and federal courts–from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010).  *See also Cullen v. Pinholster,* 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

The state appellate court rejected Dadabo's direct and postconviction appeals without discussion.  The court's decisions warrant deference under Section 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore,* 278 F.3d 1245, 1254 (11th Cir.), *reh'g and reh'g en banc denied,* 278 F.3d 1245 (2002), *cert. denied sub nom. Wright v. Crosby,* 538 U.S. 906 (2003). *See also Richter,* 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Review of the state court decision is limited to the record that was before the state

court:

> We now hold that review under § 2254(d)(1) is limited to the record that was
> before the state court that adjudicated the claim on the merits.   Section
> 2254(d)(1) refers, in the past tense, to a state-court adjudication that
> "resulted in" a decision that was contrary to, or "involved" an unreasonable
> application of, established law.  This backward-looking language requires an
> examination of the state-court decision at the time it was made.  It follows
> that the record under review is limited to the record in existence at that same
> time, i.e., the record before the state court.

*Pinholster,* 563 U.S. at 181-82.   Dadabo bears the burden of overcoming by clear and

convincing evidence a state court factual determination.   "[A] determination of a factual

issue made by a State court shall be presumed to be correct. The applicant shall have the

burden of rebutting the presumption of correctness by clear and convincing evidence."  28

U.S.C. § 2254(e)(1).   This presumption of correctness applies to a finding of fact but not

to a mixed determination of law and fact.  *Parker v. Head*, 244 F.3d 831, 836 (11th Cir.),

*cert. denied*, 534 U.S. 1046 (2001).

### EXHAUSTION OF STATE COURT REMEDIES; PROCEDURAL DEFAULT

Before a district court can grant habeas relief to a state prisoner under § 2254, the

petitioner must exhaust all state court remedies that are available for challenging his

conviction, either on direct appeal or in a state postconviction motion.   28 U.S.C.

§ 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner

must give the state courts an opportunity to act on his claims before he presents those

claims to a federal court in a habeas petition.").  *See also Henderson v. Campbell*, 353 F.3d

880, 891 (11th Cir. 2003) ("A state prisoner seeking federal habeas relief cannot raise a

federal constitutional claim in federal court unless he first properly raised the issue in the

state courts.") (citations omitted).  A state prisoner "'must give the state courts one full

opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's court of last resort, even if review in that court is discretionary." *Fruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (quoting *O'Sullivan*, 526 U.S. at 845).

To exhaust a claim, a petitioner must make the state court aware of both the legal and factual bases for his claim. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) ("Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass on and correct alleged violations of its prisoners' federal rights.'") (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)). A federal habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented." *Pruitt*, 348 F.3d at 1358. The prohibition against raising an unexhausted claim in federal court extends to both the broad legal theory of relief and the specific factual contention that supports relief. *Kelley v. Sec'y, Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004). The requirement of exhausting state remedies as a prerequisite to federal review is satisfied if the petitioner "fairly presents" his claim in each appropriate state court and alerts that court to the federal nature of the claim. 28 U.S.C. § 2254(b)(1); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d

1135, 1138 (11th Cir. 2001).  To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court."  *Wright v. Hopper*, 169 F. 3d 695, 703 (11th Cir. 1999).  *See also Murray v. Carrier*, 477 U.S. 478 (1986).  To show prejudice, a petitioner must demonstrate not only that the errors at his trial created the possibility of prejudice but that they worked to his actual and substantial disadvantage and infected the entire trial with error of constitutional dimensions.  *Unitea States v. Frady*, 456 U.S. 152, 170 (1982).  The petitioner must show at least a reasonable probability of a different outcome.  *Henderson*, 353 F.3d at 892; *Crawford v. Heaa*, 311 F.3d 1288, 1327-28 (11th Cir. 2002).

Alternatively, a petitioner may obtain federal habeas review of a procedurally defaulted claim if review is necessary to correct a fundamental miscarriage of justice.  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Carrier*, 477 U.S. at 495-96.  A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent.  *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson*, 353 F.3d at 892.  This exception requires a petitioner's "actual" innocence.  *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001).  To meet this standard, a petitioner must show a reasonable likelihood of acquittal absent the constitutional error.  *Schlup*, 513 U.S. at 327.

## DISCUSSION

### Ground One

Dadabo argues that the trial court erred in denying a motion to suppress his incriminating statements.  He alleges that his Fifth Amendment privilege against self incrimination was violated because police disregarded his request for an attorney during

a custodial interrogation.  Prior to trial, counsel moved to suppress Dadabo's statement on this basis.

The record of the hearing on Dadabo's motion to suppress reflects that Detectives John Spoor and Michael Bailey of the Pinellas County Sheriff's Office interviewed Dadabo three times in the days following the murder.  Dadabo was also given a polygraph exam. After Dadabo moved to New Windsor, New York, he became an informant for the New Windsor Police Department.   He worked with New Windsor detectives Lawrence DiGregorio and Michael Suttlehan.  Spoor and Bailey traveled to New Windsor to interview Dadabo.  On October 9, 2006, Suttlehan summoned Dadabo to the department, ostensibly regarding informant work.  (Doc. 10, Ex. 18, Vol. V, p. 766-67.)  When he arrived at the department, Dadabo initially met with DiGregorio an interview room.  (*Id.*, pp. 746-47, 768.) Then, DiGregorio informed Dadabo that some detectives were there to see him.  (*Id.*, p. 747.)  Spoor and Bailey met privately with Dadabo in the same interview room.  (*Id.*, pp. 749.)  Dadabo was provided warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). He initially requested an attorney, but then agreed to speak without an attorney present.

The transcript of the beginning of the interview provides:

JS: [1] New Windsor Police Department at 555 Union Avenue, New Windsor, New York 12553 uh this is an interview with Anthony Dadabo D-A-D-A-B-O is that correct sir, okay before begin the interview Anthony again I'm gonna advise you of your rights like I just explained to you, you have the right to remain silent anything you say can and will be used against you in a court of law you have the right to talk to a lawyer and have him or her present with you while you are being questioned if you cannot afford to hire a lawyer one will be appointed to represent you before any questioning if you wish you can decide at any time to exercise these rights and now [sic] answer any

---

[1] The participants (Dadabo, Detective John Spoor, and Detective Michael Bailey) are identified by initials in the transcript.

questions or make any statements do you understand each of these rights I've just read to you sir

AD: Yes

JS: Having these rights in mind will you talk to me today?

AD: I really would like an attorney present now

JS: Okay, okay you want an attorney?

AD: Yeah

JS: Okay well I understand that so let me tell you where we are okay we found some uh inconsistencies with Joseph [DiFiore]'s statements and we found some inconsistencies with your statements okay um for example we found the murder weapon in Hernando County and we also um found your drug dealer in Greenwood we also got your cell phone records and we got the cell towers off of that and since

MB: And where you were on Monday all day

JS: And we know what we know what happened and basically where we stand with our investigation is that Joseph is staying [sic] that he was there to do the robbery and that you did the homicide that's correct and since you, you've requested your attorney which is fine where we're gonna be going with this is your gonna be charged with this and we're gonna be out there with this out there that you're the premeditated and we're gonna go with the first degree as in Joseph's looking at just the robbery so since he's the one that cooperated and brought us to the murder weapon up in Hernando County you're the one that's gonna be taking the blunt [sic] of this so

MB: Now Joseph um may not be telling us the entire truth about his involvement but a lot of things that he says we've been able to verify um that's why we wanted to sit down and talk to you today about what's going on

AD: All right

JS: And so

AD: I'll talk

MB: Okay

AD: I got nothing to hide (inaudible)

JS: Nope, nope wait a minute did you just

AD: I'm waiving I'm waiving my right for an attorney cause I got nothing to hide

MB: Okay

JS: Okay, okay (inaudible)

MB: All right so now you initially asked for an attorney but you['re] now you['re] telling us that now you would like to talk about this a little bit

AD: Yeah

MB: You['re], you['re] certain about that?

AD: Yes

MB: Okay so you've been read your rights and now you, you agreed to speak to us about this

AD: Yes

(Doc. 10, Ex. 18, Vol. III, pp. 426-27.)  Upon subsequent questioning by Spoor and Bailey,

Dadabo made incriminating statements.

At the conclusion of the motion to suppress hearing, the state trial court made

thorough, detailed findings of fact and legal conclusions:

> We're back on the record on State of Florida versus Dadabo.
> And I will make the following findings of fact: that on August 21, 2006, that Detective Spoor came into contact with the defendant, initially when the defendant was in a police vehicle, and that the defendant was brought down to the police station at the Pinellas County Sheriff's Office at the North District Station.  And once the defendant was brought there, he was interviewed.
> The defendant was not told that he was free to leave at that time, and there was an hour interview, and the defendant was then allowed to leave. So, at the very first interview he was aware of the fact that he could be interviewed in an interview room, at a detective bureau, and that didn't necessarily mean that he was in custody because he was free to leave.
> Then they interviewed Mr. DiFiore, and then the detectives decided to interview the defendant again on that same day in that same interview room at the North District Station, in a room at the detective bureau.  This time, the

police read the defendant his *Miranda* rights, and they interviewed him, and he was never told that he was free to leave, and after the interview, he was free to leave. So, the defendant was aware that in this second interview that he could be interviewed by the police in an interview room of a detective bureau and he could be read his *Miranda* rights, and that did not necessarily mean that he was under arrest or in custody, and that he would be free to leave because they actually let him leave after that.

The very next day, after speaking with DiFiore, the police interviewed the defendant again, also at the station. Now, here, because of a tape malfunction, the defendant was advised of his *Miranda* rights twice. And he was interviewed, and then after being advised of his *Miranda* rights twice, he was free to leave.

So, this is three times where he's interviewed in an interview room at a detective bureau by Detective Spoor and Detective Bailey. He was advised of his *Miranda* rights during two of those interviews, and was advised of *Miranda* twice during one of the interviews, so a total of three times. And after each interview he was allowed to leave, and he was not told that he was free to leave during any of those interviews. But he knew that even if he was read *Miranda* and even if he was interviewed by these two detectives in an interview room in a detective bureau, that he would still be free to leave.

Then he was given a polygraph examination. There was no direct evidence that the Defendant was read *Miranda*, but it's protocol for the defendant to be advised of his *Miranda* rights before a polygraph examination, so that would be the third occasion or the fourth time that he was advised of his *Miranda* rights and he was allowed to leave. So, he knows that just because you're advised of your *Miranda* rights, it doesn't mean that you're under arrest or in custody. So, he knows that more than just about anyone on the planet, at this point.

Now, after this, the defendant ends up going back to New Windsor, where he decides that he wants to be a confidential informant, and he contacts the New Windsor Police Department and he cooperates with them. And he works as a confidential informant and he does involve himself in some deals which assist their police department. And he is very friendly with Detective DiGregorio and Detective Suttlehan.

On about six occasions, he goes to the police department himself in New Windsor. And for his own security, he decides that he wants to park in the back and he wants to go up through the back, and he's escorted up and he's interviewed each and every time, or spoken to each and every time in the interview room of the detective bureau at the New Windsor Police Department. This interview room is almost identical to the interview room that he was interviewed in at the North District Station of the Pinellas County - - of the sheriff's office on August 21 and August 22 of 2006.

On October the 9th, the defendant is asked to come in by the detective sergeant, and the defendant does come in, as always, and he goes in the same way he always goes in, and he ends up going in the same room

that he always goes in.  And the detective sergeant advises him that there are some individuals who want to speak to him, and it turns out to be Detective Spoor and Detective Bailey, who, obviously, the defendant knows very well from having had interviews with them on three previous occasions.

Now, the defendant, unlike almost anyone else, is in an environment where he is comfortable.  The whole premise of *Miranda* is that *Miranda* rights must be given when there is custodial interrogation because interviews are inherently coercive when they are done when the defendant is in custody.

Now, there are numerous cases that indicate that just because an interview is done at a police station, it doesn't necessarily mean that it is a custodial interview.  And what is even stronger evidence of a non-custodial interview would be if it was in the defendant's home or at the defendant's work, as opposed to a police station.  But here it's very unique in that the defendant actually feels comfortable in this environment because he's been there numerous times in this very room, numerous times before, with people that he has very good relationships with.  So, he's actually one of the gang here.  Not only does he know the police officers in New Windsor, but he's working with them.  So, they're all buddies, so he's in a comfortable environment and he's in a room that he's been in numerous times before.

And he is actually on his home turf there, and it's the interviewers who are the outsiders.  They're up from Florida.  That's the first time they've ever been there.  And they're up visiting the defendant on his home turf.  Now, normally, a police station would not be a defendant's home turf, but this was a very unique circumstance in that he's working with the police.

So, he is introduced again to Detective Spoor and Detective Bailey, who obviously know them very well - - or know him very well and he knows them very well.  And all conversations are very conversational.  There's no yelling and screaming and threats, and that sort of thing.  The defendant is never told that he is not free to leave at any point.

Now, the defendant is advised of his *Miranda* rights, and he initially states that he would like an attorney.  And then, Detective Spoor begins to pack up his things and begin to leave, and then he mentions that he'd been speaking with Mr. DiFiore and Mr. DiFiore basically is cooperating and, based upon that, that sometime in the future the defendant may be arrested for murder.  And the defendant then decides that he wants to speak, he doesn't want a lawyer, and he's certain about it that he wants to speak and he had nothing to hide, and then there's an interview.  Now, the interview was very conversational and very nonthreatening.

Now, if the interview was a custodial interview, it would be extremely problematic.  And let me cite a Florida Supreme Court case of *Cuervo*, C-u-e-r-v-o, *versus State*.  It came out July the 12th of 2007.  It's at 967 So.2d 155.  And basically, that case states that if a defendant is in custody and he unequivocally invokes his right to remain silent or he unequivocally asks for an attorney, obviously questioning has to stop there.

Now, I am going to find that the defendant unequivocally asked for an

attorney here.    And furthermore, the police cannot engage in any conversation that the police officer should know is necessarily likely to elicit an incriminating response from the suspect.   So, obviously, after the defendant asks for a lawyer, then they start to pack up and say, "Well, all right, but you should know this," and I'm going to find that they really didn't tell him that for his own benefit, but told him that in the hope that it may trigger a response from the defendant to cooperate.  So, if this is a custodial situation, it's very problematic.  So, the issue becomes is it custodial or not?

Now, we all know about the *Ramirez* case out of the Pasco County. . . .

Now, the initial or the most recent case that dealt with the *Ramirez* issue is *Rigterink*, R-I-g-t-e-r-I---k, *versus State*, which is a Florida Supreme Court case.  It came out January the 30th, 2009. It's 34 Fla. L. Weekly S132a, and basically it states that just because an interview is done in a interrogation room of a police station does not necessarily mean that it is a custodial interrogation. And then, of course, it goes over the *Ramirez* factors, as well, along with all the other cases that have been cited.

And what the Court has to determine is, from a totality of the circumstances, would a reasonable person believe that he is in custody? And there is a four-part test and, as we all know because we've been hearing it all afternoon now, the first part is the manner in which the police summon the suspect for questioning.

Well, the first factor, I'm going to find is consistent with a reasonable person not believing that he is in custody.  And the reason for that is the unique circumstances that we have here, where the defendant is cooperating and working with the police, and he has made numerous trips to that very interview room before, and he's very friendly and cooperative, and he is basically a colleague of these police officers.  And he goes up to this interview room, and then they advise him that there are people who want to see him, and then there is a couple of detectives that he has spoken to numerous times before.

Number two: the purpose, place, and manner of the interrogation. The purpose actually was to interview the defendant.  It was not to arrest the defendant.  Obviously, the detectives from the Pinellas County Sheriff's Office didn't have jurisdiction to arrest the defendant, and they did not come with an arrest warrant in hand.  So, there's really no doubt that the purpose of this whole thing was to interview him and not arrest him.  Now, of course, after he confessed to the whole thing, then they called the state attorney's office, and I guess they typed up an arrest warrant and they had it processed through, but that was after the interview, not before the interview.

Now, the place again was in an interview room of a detective bureau where the defendant had been numerous times before, at that particular one up in New Windsor, so that's basically his home turf, where he had been numerous times before. He had also been numerous times before with these other detectives from the Pinellas County Sheriff's Office in an interview room

just like that in Pinellas County on three different occasions, when he was allowed to leave after that.

And the manner of the interrogation was very conversational. There's no yelling and screaming. We hear some tapes where detectives are very accusatory and play all kinds of games and yell and scream and try to intimidate. We don't have any of that here.

Now, the extent to which the suspect is confronted with evidence of his or her guilt; that's number three. Well, he was confronted with evidence of his guilt, but the other factors are not consistent with a reasonable person believing that he is in custody. First of all, although the defendant is not told that he's free to leave, he is told that he may be arrested in the future for a first-degree murder charge.

Now, the important thing there is that a reasonable person wouldn't believe that he was in custody right then because he wasn't told he was being in custody then. He's being told that he may be arrested at sometime in the future. And even though he's not told that he's free to leave, when he said that he didn't - - or when he said that he wanted an attorney, they began to pack up and their stuff and leave, so he knew that he was not going to get arrested that day, that if there was going to be an arrest, it may be sometime in the future because that's what they told him. And their actions when they started packing up the things when he said he wanted a lawyer were certainly consistent with the fact that he was not in custody and he was not going to get arrested today, and he was not in custody at that particular time, that maybe in the future he would be in custody, but then he was not in custody.

And, of course, he was aware of the fact that the detectives were from Florida, and that they obviously wouldn't have jurisdiction to arrest him then, especially when they said that he may be arrested in the future and did not indicate that he was arrested then.

Number four: whether the suspect is informed that he or she is free to leave the place of questioning. Again, he wasn't specifically informed that he was free to leave, but we have the very unique circumstance, unlike most defendants, where the defendant has been interviewed numerous times in a room just like this by these very detectives, and was read *Miranda* and was free to leave every time. So, as I said, there were three interviews by these very detectives with the defendant in an interview room, just like this kind of interview room.

And again, the interview room in PInellas County actually is a more custodial setting than the one up there is New Windsor. And the reason is because down here it is the home turf of the detectives. It's their interview room in their police department. And each and every time, all three times, and after the defendant is read *Miranda* on two occasions, but an actual total of three, the defendant is released.

So, when they're in New Windsor it's less custodial than in Pinellas County because it's actually his interview room in his turf in his police department, and the detectives are actually a couple of guests in his police

department.   So, I realize he's not an actual employee of the police department and that he doesn't own the police department, but he's an agent and informant and an associate of this police department.  So, it's really his home turf and less custodial than down here, and each and every time down here he was let go.  He was released and he was not arrested.

So, even though he wasn't told that he was free to leave, all of his experiences indicate that he would be free to leave.  And he was actually told that he may be arrested in the future, but there was no indication that he was arrested then.  And, as a matter of fact, when he said he wanted an attorney, they started to pack up their things.  All of these things are consistent with a reasonable person, under all these facts and circumstances, believing that he is not actually in custody during this interview.

So, based upon the foregoing, I'm going to deny the motion to suppress.

(Doc. 10, Ex. 18, Vol. V, pp. 863-75.)

The record supports the state court's factual findings concerning the events and interview.  Whether Dadabo was in custody at the time he requested an attorney is relevant because "the right to *Miranda* warnings attaches when a custodial interrogation begins." *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006).  *Miranda* requires that an in-custody suspect be informed, among other warnings, "that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  384 U.S. at 479.  When an accused requests counsel, custodial interrogation must end until counsel is provided unless the accused initiates further discussion.  *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

Determining custody involves examining the circumstances surrounding the interrogation and whether, under those circumstances, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.  *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  While a court determining whether an individual was in custody must examine all of the circumstances of the interrogation, "the ultimate inquiry

is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).   "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant."   *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996.)

The Supreme Court has further explained:

As used in our *Miranda* case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation," *Stansbury v. California,* 511 U.S. 318, 322–323, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) *(per curiam),* a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). And in order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation." *Stansbury, supra,* at 322, 325, 114 S.Ct. 1526 (internal quotation marks omitted). Relevant factors include the location of the questioning, see *Shatzer, supra,* at —— – ——, 130 S.Ct., at 1223–1226, its duration, see *Berkemer v. McCarty,* 468 U.S. 420, 437–438, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), statements made during the interview, see *Mathiason, supra,* at 495, 97 S.Ct. 711; *Yarborough v. Alvarado,* 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); *Stansbury, supra,* at 325, 114 S.Ct. 1526, the presence or absence of physical restraints during the questioning, see *New York v. Quarles,* 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), and the release of the interviewee at the end of the questioning, see *California v. Beheler,* 463 U.S. 1121, 1122–1123, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) *(per curiam).*

Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda.* We have "decline[d] to accord talismanic power" to the freedom-of-movement inquiry, *Berkemer, supra,* at 437, 104 S.Ct. 3138, and have *1190 instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda.* "Our cases make clear ... that the freedom-of-movement

test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Shatzer,* 559 U.S., at ——, 130 S.Ct., at 1224.

*Howes v. Fields*, 132 S.Ct. 1181, 1189-90 (2012).

The record supports the finding that Dadabo was not in custody at the time he requested an attorney.  Dadabo traveled voluntarily to the police station, where he had been on numerous prior occasions for informant work.  (Doc. 10, Ex. 18, Vol. V, pp. 745, 764.)  He was familiar with both the New Windsor officers and with Spoor and Bailey. There is no indication that Dadabo had anything other than a cordial relationship with these law enforcement officers.  That Dadabo was familiar with his surroundings supports the conclusion that he was not in custody.  *See, e.g., United States v. Maldonado*, 562 Fed. App'x 859, 861 (11th Cir. 2014) (noting that the fact an individual was interrogated in the familiar surroundings of her workplace weighed against the finding of a custodial interrogation); *Brown*, 441 F.3d at 1348 ("Although the location of the interview is surely not dispositive in determining whether the interviewee was in custody, '[c]ourts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home.'") (quoting *United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994)).  That the interview occurred in a police station is not enough to render it custodial.  *See Beheler*, 463 U.S. at 1125 ("[W]e have explicitly recognized that *Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'") (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

Furthermore, although "the fact that an individual is told he is not under arrest and is free to leave is a fact of substantial importance in determining whether a reasonable

person would have felt free to leave," *Brown*, 441 F.3d at 1347, that Dadabo was not informed of this did not mean he was in custody.  He was in the unique situation of being with officers he knew and who, as the state court put it, had traveled to visit Dadabo on his "home turf."   In his prior experience being interviewed by these officers, he had been provided *Miranda* warnings several times, but had not been arrested and left at the end of the interviews.  (Doc. 10, Ex. 18, Vol. V, pp. 782, 785, 787-90.)  Dadabo does not allege that he was not permitted to leave the interview room, that the room was physically arranged so that he could not leave, or that he was restrained within the room.  Spoor testified that he and Bailey did not block Dadabo's ability to exit when they entered the interview room.  (*Id.*, p. 797.)  Dadabo does not complain that his remaining in the room was involuntary, or that he asked or tried leave the room.  Testimony of Spoor, Bailey, DiGregorio, and Suttlehan reflects that Dadabo did not say he wanted to leave or physically attempt to leave when Spoor and Bailey came into the room.  (*Id.*, pp. 748, 769, 797-98, 825.)  Although the record shows that to leave the police building, Dadabo would have to be escorted through locked doors by New Windsor officers (*see id.*, pp. 757-58), there is no evidence that he was unable to leave the interview room itself to avoid further contact with Spoor and Bailey if he had wanted to do so.

Dadabo does not establish that he was restrained to the degree associated with formal arrest such that a reasonable person would not have felt free to leave.  Thus, the record supports the state court's determination that Dadabo was not in custody.  If a suspect is not in custody, his Fifth Amendment privilege against self-incrimination is not at issue.  *See Edwards*, 451 U.S. at 485-86 (absent custodial interrogation, there is no infringement of the Fifth Amendment right to have counsel present even where a suspect

requests an attorney, and therefore, there would be no occasion to determine whether there had been a valid waiver of this right).  *See also Bobby v. Dixon*, 132 S.Ct. 26, 29 (2011) (the United States Supreme Court has "never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation.'") (citation omitted);  *Montejo v. Louisiana*, 556 U.S. 778, 795 (2009) (stating if the defendant is not in custody, *Miranda* and its progeny do not apply).  Accordingly, even if the officers can be said to have ignored Dadabo's request for an attorney, Dadabo cannot show that this resulted in a constitutional violation because *Miranda* protections were inapplicable.

Dadabo has not established that the state court's finding is contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts.[2]  He is not entitled to relief on Ground One.

**Ground Two**

The Sixth Amendment guarantees a defendant in a state criminal trial an independent constitutional right to self-representation.  *Faretta v. California*, 422 U.S. 806, 819-20 (1975).  Dadabo asserts that he was denied this right.  Specifically, he alleges that "the Trial Court failed to follow procedure during two Nelson Hearings and failed to inform Petitioner of his Constitutional right to self-representation."  (Doc. 1, p. 9.)

The trial court conducted several pre-trial hearings after Dadabo complained that

---

[2] Dadabo states that detectives threatened and coerced him into making a statement by "suggesting more favorable treatment."  (Doc. 1, p. 7.)  Dadabo does not expressly claim that his statement was rendered involuntary due to coercion and threats by police in violation of his federal constitutional rights.  Even interpreting the claim as such, it is unexhausted because it was not raised on appeal.  (Doc. 10, Ex. 2.)  As Dadabo cannot return to state court to file a successive appeal, *see* Fla. R. App. P. 9.140, the claim is procedurally defaulted.  *See Smith*, 256 F.3d at 1138.  Dadabo does not allege or show that an exception applies to overcome the default.  Moreover, this vague and generalized claim is not supported by any facts.  Dadabo has not shown that his statement was involuntarily elicited based upon a promise of preferential treatment for cooperation, or any other coercion or threats.  Dadabo's assertion cannot provide relief.

counsel was rendering inadequate representation.  On March 25, 2008, after hearing from Dadabo and counsel, the court found that counsel was acting competently.  (Doc. 10, Ex. 18, Supp. I, p. 897.)  At the next hearing during which Dadabo indicated he did not want counsel to represent him, on April 22, 2008, counsel stated his belief that a psychological exam was necessary.  (*Id.*, p. 905.)  Accordingly, the court ordered that Dadabo be evaluated.  (*Id.*, p. 907.)  Later, on May 12, 2008, after Dadabo was found competent to proceed, the court again heard his complaints about counsel's representation.  It determined that counsel was representing Dadabo "very competently and is doing everything that he should be doing in this case."  (*Id.*, p. 926.)

Under Florida law, when a defendant asks that his counsel be discharged due to incompetence, the trial court must determine whether adequate grounds exist to do so. *See Nelson v. State*, 274 So.2d 256 (Fla. 4th DCA 1973).  If the trial court finds no basis to discharge counsel, "the trial court should so state on the record and advise the defendant that if he discharges his original counsel the State may not thereafter be required to appoint a substitute." *Id.* at 259.  The state trial court determined no grounds existed to discharge counsel but did not inform Dadabo that he would not be appointed alternate counsel if his attorney was discharged.  The court did not make any other statements about self-representation during these hearings.

Dadabo's argument presents a question of state law because he asserts that the court failed to follow *Nelson*'s procedures for Florida trial courts.  Because this claim does not raise a federal question, it is not cognizable in this federal habeas proceeding.  Federal habeas relief for a person in custody on a state court judgment is available only if that custody violates the Constitution, laws, or treaties of the United States.  28 U.S.C.

§ 2254(a).  *See Wainwright v. Goode*, 464 U.S. 78, 83-84 (1983) ("It is axiomatic that federal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension.") (citations omitted).

Even interpreting Dadabo's claim as federal in nature to the extent he alleges the trial court violated his federal constitutional rights regarding self-representation, he is not entitled to relief.  First, Dadabo presents no authority providing that the United States Constitution compels the *Nelson* procedures and requires the that the court inform a defendant of his Sixth Amendment right to self-representation simply because he lodges a pre-trial complaint about trial counsel's performance.

Nor can Dadabo show that the court otherwise violated his right to self-representation.  In order to invoke the right, a defendant must unequivocally state his desire to proceed *pro se*.  *See Faretta*, 422 U.S. at 835-36.  *See also Nelson v. Alabama*, 292 F.3d 1291, 1295 (11th Cir. 2002) ("Before a court allows a criminal defendant to proceed *pro se*, the defendant must clearly and unequivocally assert his right of self-representation.").

As Dadabo did not unequivocally request to proceed as his own attorney (see Doc. 10, Ex. 18, Supp. I), he cannot show that the state court deprived him of his Sixth Amendment right to self-representation.  Accordingly, Dadabo fails to establish that the state appellate court's rejection of his claim was contrary to or an unreasonable application of clearly established law, or was based on an unreasonable determination of the facts. Dadabo is not entitled to relief on Ground Two.

**Ground Three**

Dadabo asserts that the trial court committed fundamental error when it incorrectly instructed the jury on the lesser-included offense of manslaughter by act.  He alleges that

the instruction on manslaughter by act "erroneously implied an additional element of 'intent.' There is no 'intent' element in manslaughter by act, manslaughter by act only requires an 'intentional act', not 'intent to kill.'" (Doc. 1, p. 10.)

Dadabo does not assert a federal constitutional claim in his habeas petition. Rather, he has raised a claim based on Florida law. Federal habeas relief is not available for errors of state law. *See Goode*, 464 U.S. at 83-84; *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Therefore, a jury instruction that "was allegedly incorrect under state law is not a basis for federal habeas relief." *McGuire*, 502 U.S. at 71-72. Accordingly, Dadabo's claim is not cognizable in this federal habeas proceeding.

Furthermore, even if his argument could be interpreted as including a federal claim, it would be unexhausted due to Dadabo's failure to raise the federal nature of the claim on direct appeal. Dadabo asserted on appeal that the trial court fundamentally erred in giving an instruction that did not properly state Florida law. (Doc. 10, Ex. 2, pp. 43-45.) But he did not cite the federal constitution or any federal authority. (*Id.*) "The exhaustion doctrine requires the petitioner to 'fairly present' his federal claims to the state courts in a manner to alert them that the ruling under review violated a federal constitutional right." *Pearson v. Sec'y, Dep't of Corr.*, 273 Fed. App'x 847, 849-50 (11th Cir. 2008) (citing *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995)). State procedural rules do not provide for successive direct appeals. *See* Fla. R. App. P. 9.140. Therefore, Dadabo's unexhausted federal claim is procedurally defaulted. *See Smith*, 256 F.3d at 1138. Dadabo does not argue or

establish that an exception applies to overcome the default.[3]

Notwithstanding the default of any federal claim that can be deduced from Dadabo's habeas petition, he fails to show entitlement to relief.

> The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned.

*Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quotation marks, citations, and footnote omitted). Dadabo relies on *State v. Montgomery*, 39 So.3d 252 (Fla. 2010). The Florida Supreme Court held that the standard jury instruction on manslaughter by act used at Montgomery's trial misstated Florida law by adding an element of intent to kill. *Id.* at 255-57.[4] Providing the instruction as a lesser offense constituted fundamental, per se reversible error in Montgomery's case because Montgomery was convicted of second degree murder,

---

[3] The Court takes note that, for the first time, Dadabo cites the federal constitution in support of his claim in his reply. (Doc. 11, pp. 11-12.) However, the claim remains unexhausted and procedurally defaulted because he did not raise the constitutional dimension of the claim before the state court. Furthermore, the claim is without merit.

[4] The manslaughter by act instruction at issue in *Montgomery* was provided at Dadabo's trial. The jury was instructed in relevant part:

> To prove the crime of manslaughter, the State must prove the following two elements beyond a reasonable doubt:
>
> Number one: Mary Dittus is dead.
>
> Number two: Anthony Dadabo intentionally caused the death of Mary Dittus, or the death of Mary Dittus was caused by the culpable negligence of Anthony Dadabo. . . .
>
> In order to convict of manslaughter by intentional act, it is not necessary for the State to prove that the defendant had a premeditated intent to cause death, only an intent to commit an act which caused death.

(Doc. 10, Ex. 18, Vol. XIII, pp. 1266-67.)

an offense only one step removed from manslaughter.  *Id.* at 259.

*Montgomery* did not involve a conviction for first degree murder.  The court noted that "manslaughter as a lesser included offense is two steps removed from first-degree murder. . . . 'when the trial court fails to properly instruct on a crime two or more degrees removed from the crime for which the defendant is convicted, the error is not per se reversible, but instead is subject to a harmless error analysis.'"  *Id.* (quoting *Pena v. State*, 901 So.2d 781, 787 (Fla. 2005)).  At the time Dadabo's conviction became final, the law followed by Second District Court of Appeal, which heard Dadabo's appeal, was that instructing the jury on manslaughter by culpable negligence cured error in the manslaughter by act jury instruction.  *See Barros-Dias v. State*, 41 So.3d 370, 371 (Fla. 2d DCA 2010) ("[Montgomery] does not change the outcome in Barros-Dias' case because the jury in his case was instructed on both manslaughter by act and manslaughter by culpable negligence.").[5]  The trial court instructed Dadabo's jury on manslaughter by culpable negligence.   (Doc. 10, Ex. 18, Vol. XIII, pp. 1266-67.)  Accordingly, Dadabo fails to establish that an error in the manslaughter by act instruction infected his trial such that his conviction violates federal due process.   *See Henderson*, 431 U.S. at 154.  Dadabo has not shown entitlement to relief on Ground Three.

**Ground Four**

Dadabo raises six allegations of ineffective assistance of trial counsel.  Claims of ineffective assistance are analyzed under the test set forth in *Strickland v. Washington*, 466

---

[5] The mandate affirming Dadabo's conviction and sentence issued on September 8, 2011.  (Doc. 10, Ex. 5.)  In 2014, the Second District Court of Appeal's decision in *Barros-Dias* was quashed on the basis of a 2013 decision, *Haygood v. State*, 109 So.3d 735 (Fla. 2013).  *See Barros-Dias v. State*, 137 So.3d 1019 (Fla. 2014).

U.S. 668 (1984):

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*, first, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052.

*Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998). Demonstrating deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* Additionally, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.*

Dadabo must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691-92. To show prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine

confidence in the outcome." *Id.* at 694.  A petitioner cannot meet his burden merely by showing that counsel's choices were unsuccessful:

> The test has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992).  *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious: the trial lawyers, in every case, could have done something more or something different.  So, omissions are inevitable . . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (en banc) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

Sustaining a claim of ineffective assistance of counsel on federal habeas review is difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted).  *See also Pinholster*, 563 U.S. at 202 (a petitioner must overcome the "'doubly deferential' standard of *Strickland* and AEDPA.").

If a claim of ineffective assistance of counsel can be resolved through one of the *Strickland* test's two prongs, the other prong need not be considered.  466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds.").

**Grounds Four (A), (B), and (D)**

In Ground Four(A), Dadabo argues that trial counsel was ineffective for failing to move to appoint an expert to examine his competency to proceed and to rebut the State's expert. In Ground Four(B), he asserts that counsel was ineffective for stipulating to his competency. In Ground Four(D), Dadabo claims that trial counsel was ineffective for failing to investigate his competency, thereby resulting in the denial of a fair suppression hearing and jury trial "because the 'severity' and duration of Petitioner's 'documented' mental illness was omitted from consideration." (Doc. 1, p. 13.) The postconviction court treated these ineffective assistance claims together and denied them in reviewing Dadabo's rule 3.850 motion:

> Defendant's . . . claims are highly inter-related and collectively allege that counsel was ineffective for failing to adequately address Defendant's competency to stand trial. Specifically, he claims counsel was ineffective for 1) stipulating to court psychologist Dr. Jill Poorman's finding that Defendant was competent, 2) failing to request the appointment of a second psychological evaluator, and 3) failing to further investigate Defendant's competency. In its Response, the State contends that Defendant's claims are facially insufficient because he does not allege that he was actually incompetent. However, Defendant's motion does allege that he advised counsel of his competency concerns and claims that he would have been found incompetent to proceed if counsel had requested further evaluation. The Court therefore finds Defendant's claim facially sufficient and will address its merits. See Arseneau v. State, 77 So.3d 1280, 1284 n.1 (Fla. 2d DCA 2012).
>
> Defendant claims he advised counsel that he was prescribed psychotropic medications and had previously been diagnosed as bipolar, manic depressive, and paranoid schizophrenic. Defendant argues that, having been advised of Defendant's mental health history, counsel was ineffective for stipulating to Defendant's competency; especially because Dr. Poorman's exam was deficient and she did not provide a written report as required by Florida Rule of Criminal Procedure 3.211. Defendant contends that counsel should have continued to investigate Defendant's mental health and requested a second psychological evaluator, who would have found him incompetent to proceed.
>
> The State contends that counsel was not ineffective for failing to

further investigate Defendant's competency or request the appointment of an additional expert. The State argues that counsel had no reasonable basis to request an additional expert after reviewing Dr. Poorman's report and the Court would not have been required to appoint another psychologist because Rule 3.210(b) only indicates that the Court "*may* order the defendant to be examined" by up to three experts. (*emphasis added*). The State further submits that Defendant's present claims of incompetency are conclusory and refuted by the record of Defendant's display of appropriate courtroom behavior and his other communications with the Court including a *pro se* motion to dismiss and letter requesting a plea agreement for a reduced charge.

The record reflects that the Court appointed Dr. Poorman to evaluate Defendant's competency pursuant to counsel's request at a pretrial hearing. Defendant stated during the hearing that he took medications for a mental illness and was incompetent because he received social security benefits. Contrary to Defendant's allegation, Dr. Poorman did in fact file a written report finding Defendant competent pursuant to the factors enumerated in Rule 3.211. Counsel and the State subsequently stipulated to Defendant's competency based on Dr. Poorman's findings. It is therefore apparent from the record that counsel did address Defendant's mental health and appropriately requested a competency evaluation. It is also apparent that counsel had no basis to object to Dr. Poorman's failure to file a written report because the report was in fact submitted. Defendant claims Dr. Poorman's examination was deficient because she spoke with him for 5 minutes and only asked him "1) what day it was, 2) what time it was, and 3) was it day or night." Defendant's claim is directly refuted by the contents of Dr. Poorman's report, which indicates her findings as to each of the relevant criteria explained in Rule 3.211. Defendant has offered only conclusory and speculative argument that her evaluation was otherwise deficient. The Court finds these aspects of Defendant's claims are without merit and they are denied.

Defendant correctly contends, however, that when the matter of his competency was pending before the Court, Rule 3.210(b) provided that the court "*shall* order the defendant to be examined by no more than 3, nor fewer than 2, experts" upon motion of the court or counsel. Fla. R. Crim. P. 3.210(b) (2008) (*emphasis added*). The State's Response refers to a subsequent version of the rule that does not require the appointment of two experts. See Fla. R. Crim. P. 3.210(b) (2012). The Court therefore does not find the State's argument persuasive on this point because counsel's request for an additional evaluator would have been well-taken pursuant to the rule.

Nevertheless, the Court finds Defendant is unable to establish prejudice under the second prong of Strickland. To establish an ineffective assistance of counsel claim with regard to counsel's handling of a competency issue, the defendant must demonstrate actual prejudice. See Thompson v. State, 88 So.3d 312, 318 (Fla. 4th DCA 2012). Conclusory

allegations of incompetency are insufficient to warrant further proceedings. Id. at 319 (*citing* Atwater v. State, 788 So.2d 223, 229 (Fla. 2001)). "Postconviction evidentiary hearings regarding competency issues are reserved for extraordinary situations where the movant makes a strong preliminary showing that competency to proceed was legitimately in question at the relevant stage." Id. at 321. Suffering from a mental illness does not necessarily render a person incompetent for purposes of proceeding to trial or entering a plea and an allegation that a defendant has suffered from a mental illness does not, in and of itself, warrant a postconviction evidentiary hearing on competency. See id. at 319 ("[N]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges.") (*quoting* Card v. Singletary, 981 F.2d 481, 487-88 (11th Cir. 1992)). The movant must set forth circumstances that create a real, substantial, and legitimate doubt as to his or her ability to understand the charges or assist counsel. Id. at 321. In evaluating a defendant's claim, the court should consider the totality of the circumstances during the relevant time period. Id. at 320.

A defendant is competent to proceed if he has the "sufficient present ability to consult with counsel with a reasonable degree of rational understanding and whether the defendant has a rational, as well as factual, understanding of the pending proceedings." Fla. R. Crim. P. 3.211(a)(1). When evaluating a defendant's competency, trial courts must consider the defendant's capacity to (1) appreciate the charges or allegations against the defendant; (2) appreciate the range and nature of possible penalties; (3) understand the adversary nature of the legal process; (4) disclose to counsel facts pertinent to the proceedings at issue; (5) manifest appropriate courtroom behavior; and (6) testify relevantly. Fla. R. Crim. P. 3.211(a)(2)(A).

As discussed, the record reflects that the court appointed Dr. Poorman to evaluate Defendant's competency pursuant to counsel's request during a pretrial hearing. Counsel and the State subsequently stipulated to Defendant's competency based on Dr. Poorman's written report. Defendant has offered nothing more than conclusory allegations of incompetency to rebut Dr. Poorman's findings. It is apparent from Defendant's representations to the Court and Dr. Poorman's report that Defendant has some history of mental illness. However, a mental illness in and of itself does not establish that Defendant was incompetent to stand trial and the record does not support such a finding.

To the contrary, the record reflects that Defendant had a rational understanding of the proceedings pursuant to Rule 3.211. Defendant made several attempts to have counsel discharged from his case, including filing a grievance with the Florida Bar. Defendant explained at various points during the proceedings that he wanted counsel to provide him additional discovery, have evidence suppressed, move to sever his trial from his codefendant, and pursue a plethora of other pre-trial matters that Defendant

requested.  Defendant also participated in plea negotiations and authorized his attorney to make a 15 year prison offer to the State, which was rejected. Defendant even delivered *pro se* correspondence to the Court indicating that he wanted to accept a plea to a reduced charge, and be sentenced to a "downward departure" of 10 years in prison followed by 10 years of probation.  It is readily apparent that Defendant understood the relevant aspects of the pre-trial and trial process including his attorney's role in assisting him, the purpose of discovery, pretrial motions, plea negotiations, and sentencing dispositions.  This Court has no basis to find that Defendant has met his burden of demonstrating a substantial and legitimate doubt as to his competency.  Defendant's claims regarding his competency are therefore denied.

(Doc. 10, Ex. 10, pp. 227-230) (court's record citations and footnote omitted).

The conviction of a mentally incompetent defendant violates due process.  *Pate v. Robinson*, 383 U.S. 375 (1966).  The federal standard for competency to stand trial is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding–and whether he has a rational as well as factual understanding of the proceedings against him."  *Dusky v. United States*, 362 U.S. 402, 402 (1960).  *See also Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial.").  "[A] petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence." *James v. Singletary*, 957 F.2d 1562, 1571 (11th Cir. 1992).

Dadabo's federal habeas petition does not specify the facts that he alleges show his incompetency.  He alleged in his postconviction motion that he had been prescribed psychotropic medication and received diagnoses of bipolar, manic depressive, and

paranoid schizophrenic.  (Doc. 10, Ex. 6, p. 9.)  Dadabo also claimed that he was under a

doctor's care and had previously been institutionalized and attempted suicide.  (*Id.*) But

Dadabo has not demonstrated that counsel performed deficiently in stipulating to his

competency,[6] failing to investigate his competency, or not seeking further evaluation[7] based

on this information.  That a defendant suffers or has suffered from mental illness does not

necessitate a finding of incompetency to proceed.   In other words, Dadabo's history of

mental illness would not demonstrate incompetency without a specific showing that his

illness rendered him incompetent during the relevant pre-trial period. *Medina v. Singletary*,

59 F.3d 1095, 1107 (11th Cir. 1995) ("[N]ot every manifestation of mental illness

demonstrates incompetence to stand trial; rather, the evidence must indicate a present

inability to assist counsel or understand the charges.") (quoting *Card v. Singletary*, 981 F.2d

481, 487-88 (11th Cir. 1992)).    Furthermore, a defendant's use of psychiatric drugs is

relevant but not determinative to establishing incompetency.  *Sheley v. Singletary*, 955 F.2d

1434 (11th Cir. 1992).   Additionally, a prior suicide attempt does not always signal

incompetency to stand trial.  *Drope*, 420 U.S. at 180.

In addition, as the state court noted, the record of several pre-trial hearings shows

that Dadabo participated in the proceedings.  (Doc. 10, Ex. 18, Supp. I.)  And, prior to trial,

he presented several intelligible *pro se* documents seeking relief, including a letter to the

---

[6] With respect to counsel's stipulation, the state court's factual finding that Poorman entered a written report addressing the provisions of Florida Rule of Criminal Procedure 3.211 is presumed correct, and Dadabo does not challenge this finding.  *See* 28 U.S.C. § 2254(e).

[7] Although Dadabo claims that counsel should have sought evaluation by another expert to rebut the "State's expert," he cites no record evidence that he was examined by an expert for the State.  Rather, when the state court appointed Poorman, it noted she was the court psychologist.  There was no indication Poorman was to function as an expert for the State. (Doc. 10, Ex. 18, Supp. I, pp. 906-07.)

court in which he sought a plea agreement. (Doc. 10, Ex. 18, Vol. I, pp. 30, 35-41, 51-53, 82-86.) Dadabo has not established that at the relevant time, he lacked the ability to consult with counsel with a reasonable degree of rational understanding, or that he did not have a rational and factual understanding of the proceedings. Nor does he allege or explain how further action by counsel would have uncovered information demonstrating his incompetence to proceed. Thus, Dadabo has not established that counsel was ineffective for the reasons alleged, or that he was prejudiced by counsel's performance. "In order to demonstrate prejudice from counsel's failure to investigate his competency, a defendant has to show that there exists 'at least a reasonable probability that a psychological evaluation would have revealed that he was incompetent to stand trial.'" *Futch v. Dugger*, 874 F.2d 1483, 1487 (11th Cir. 1989) (quoting *Alexander v. Dugger*, 841 F.2d 371, 375 (11th Cir. 1988)).

Dadabo does not establish that the state court unreasonably applied *Strickland* or unreasonably determined the facts in reaching its decision. Consequently, he is not entitled to relief on Grounds Four (A), (B), and (D).

**Ground Four (F)**

Dadabo claims counsel was ineffective for failing to investigate an insanity defense. In support, he alleges that his "mental health history is extensive." (Doc. 1, p. 13.) The state court rejected his claim as follows:

> The Defendant alleges that counsel was ineffective for failing to investigate an insanity defense and that investigation would have revealed that the Defendant was insane at the time of the murder. The Defendant claims that his ex-wife, Lori Dadabo, told counsel that the Defendant a) was previously deemed incompetent and mentally unstable; b) was on psychotropic medications; c) was under the care of a psychiatrist; d) was diagnosed as bi-polar, manic depressive, and paranoid schizophrenic; and

e) had prior suicide attempts, psychotic episodes, and hospitalizations.  The Defendant claims that he requested an insanity defense but counsel told him that it was "not the way to go."

The Defendant admits that counsel considered the Defendant's request for an insanity defense but rejected it.  Under the circumstances described by the Defendant this was sound trial strategy on the part of counsel.  See Asay v. State, 769 So. 2d 974, 984 (Fla. 2000) ("the defendant bears the burden of proving that counsel's representation was unreasonable under prevailing professional standards and was not a matter of sound trial strategy").  Mental infirmity, disease, or defect by itself does not constitute an insanity defense.  See Section 775.027, Florida Statutes; see also Walsh v. State, 751 So. 2d 740, 741 (Fla. 1st DCA 2000).  Likewise, diminished capacity is not a viable defense in Florida.  See Chestnut v. State, 538 So. 2d 820, 820 (Fla. 1989); Evans v. State, 946 So. 2d 1, 11 (Fla. 2006).  The Defendant admits in his motion that he was taking his prescribed medications and he makes no allegation that the medications were not, indeed, managing the illness.  Further, the Defendant admits that he and his ex-wife told counsel about the Defendant's mental disabilities in detail.  The Defendant fails to allege that had counsel further investigated the Defendant's mental illnesses that the investigation would have revealed something that had not already been made known to counsel.  This claim is denied.

(Doc. 10, Ex. 7, pp. 38-39.)

Insanity at the time of commission of an offense is an affirmative defense under

Florida law.  § 775.027(1), Fla. Stat.  Insanity is shown when:

(a) The defendant had a mental infirmity, disease, or defect; and

(b) Because of this condition, the defendant:

1. Did not know what he or she was doing or its consequences; or

2. Although the defendant knew what he or she was doing and its consequences, the defendant did not know that what he or she was doing was wrong.

Mental infirmity, disease, or defect does not constitute a defense of insanity except as provided in this subsection.

Id.  Thus, it is clear that mental infirmity, disease, or defect alone does not give rise to an

insanity defense.  Such a condition must affect the defendant's cognition in the manner

specified in the statute.   Furthermore, it is the defendant's burden to prove insanity by clear and convincing evidence.   § 775.027(2), Fla. Stat.

In his postconviction motion, Dadabo raised information about his mental health history similar to that which he provided in support of his claim involving competency.  (Doc. 10, Ex. 6, 22-23.)  He also made a conclusory statement that "Defendant, because of his mental diseases was totally unable to under [sic] the nature and quality of his act and one of the medications he was prescribed is because sometimes he can not distinguish right from wrong."  (Doc. 10, Ex. 6, p. 23.)  As the state court noted, Dadabo asserted that counsel was aware of his mental health information and considered but rejected an insanity defense.   The record supports the state court's determination that Dadabo failed to establish what further investigation by counsel would have revealed to show that an insanity defense was viable.

Furthermore, to the extent that the state court's decision that counsel was not ineffective for opting not to pursue an insanity defense based on known information him concerned an interpretation of the insanity defense as set forth in Florida law, deference must be afforded to the state court's decision.   *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005) ("The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [petitioner's counsel] done what [petitioner] argues he should have done. . . . It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.") (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997)); *Will v. Sec'y, Dep't of Corr.*, 278 Fed. App'x 902, 908 (11th Cir. 2008) ("Although an ineffective-assistance-of-counsel claim is a *federal* constitutional claim, which we

consider in light of the clearly established rules of *Strickland*, when 'the validity of the claim that [counsel] failed to assert is clearly a question of *state* law, . . . we must defer to the state's construction of its own law.'") (citing *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984)).

Dadabo fails to show that counsel was ineffective for failing to investigate an insanity defense, or that there is a reasonable probability the outcome of the proceeding would have been different had counsel done so. He has not established that the state court unreasonably applied *Strickland* or unreasonably determined the facts in rejecting his claim. Consequently, Dadabo is not entitled to relief on Ground Four (F).

**Ground Four (C)**

Dadabo claims that trial counsel was ineffective for misadvising him not to testify at trial because that the jury would learn the number and nature of his prior felony convictions. Dadabo raised this claim in his postconviction motion, asserting that he would have testified that "he did not participate in the actual murder of the victim; was not present when the victim actually died; and was only present during certain portions of the crime." (Doc. 10, Ex. 6, p. 7.) The state court denied Dadabo's claim:

> Defendant alleges counsel was ineffective for advising Defendant that the State could elicit testimony about the nature of his prior convictions and prison sentences if he testified at trial. He claims that, had counsel accurately advised that the State could not inquire into those matters, he would have testified that "he did not participate in the actual murder of the victim; was not present when the victim was actually killed, and was only present during certain portions of the crime." In its Response, the State argues that counsel's advice not to testify was strategic and not unreasonable; given that Defendant had already provided several different statements to law enforcement about his involvement in the offense. The State further contends that Defendant cannot establish that he was prejudiced because Defendant's alleged testimony would have been cumulative.

Defendant correctly states that, generally, the State cannot inquire into the nature of a defendant's prior convictions on cross-examination if the Defendant testifies at trial.  See § 90.610(1), Fla. Stat.; Rivera v. State, 2 So.3d 1086, 1087 (Fla. 4th DCA 2009); but see Rogers v. State, 964 So. 2d 221, 223 (Fla. 4th DCA 2007) ("An exception to the general rule prohibiting presentation of evidence on prior convictions exists when a defendant engages in 'spin control' by characterizing the prior convictions in a way favorable to his case at trial" and the State is then entitled to inquire further regarding the defendant's prior convictions).  However, the Court finds that Defendant's claim is without merit.  When a defendant alleges that counsel misadvised him or her not to testify at trial, the Court must consider whether 1) the defendant voluntarily agreed not to take the stand, and 2) no reasonable attorney would have discouraged the defendant from testifying. See Simon v. State, 47 So. 3d 883, 885 (Fla. 3d DCA 2010).

At trial, the Court conducted a colloquy with Defendant about his right to testify.  Defendant affirmed that he understood the proceedings and that his mind was clear.  The Court advised that Defendant had an absolute right to choose whether or not to testify in the case and that if he chose to testify, the jury would be instructed to weigh his credibility like any other trial witness. Defendant was also advised that his decision to testify was his alone and that counsel could render an opinion, but that the decision was ultimately Defendant's to make; Defendant confirmed that he understood.  Defendant conveyed that he had sufficient time to confer with counsel and chose not to testify.  Defendant confirmed that he was not forced or threatened by anyone not to testify.  It is apparent from the record that the Court advised Defendant that he could choose to testify or not testify on his own behalf at that point in the trial and Defendant, having conferred with counsel, chose not to testify. Defendant affirmed that he was not forced or threatened into making his decision and believed it was in his best interest not to testify.  The Court therefore finds it clear from the record that Defendant's decision not to testify was freely and voluntarily made.

The Court further finds that counsel's advice was not unreasonable under the circumstances.  As counsel explained at trial, he advised Defendant not to testify because he had already given five statements to law enforcement and "if he [took] the stand that's his sixth story."  Additionally, Defendant would have been subject to vigorous cross-examination by the State regarding those statements and could have elicited testimony that Defendant had been convicted of prior felonies.  The number of prior felonies would have at least been brought to the jury's attention in weighing the credibility of Defendant's testimony, even if the State was not able to inquire into the nature of the specific convictions.

Finally, the Court finds that Defendant has failed to establish a reasonable probability that the outcome of his trial would have been different if he had testified that he was only present during "parts" of the crime.  As the State points out, Defendant gave five different interviews to law enforcement;

providing varied details about the offense each time.  Defendant eventually admitted to conspiring with his codefendant to ambush and rob the victim in her home.  Defendant's bloody palm and shoe prints were found at the scene, and the weapons later recovered by police were consistent with the murder weapons Defendant described in his police interviews.  Furthermore, the State's theory at trial was that even if Defendant did not strike or stab the victim at all, he was guilty of first-degree felony murder as a principal actor in the killing because he helped his codefendant perpetrate the plan to rob the victim.  The jury was accordingly instructed that it should find Defendant guilty of first-degree felony murder if it found that 1) the victim was dead, 2) the death occurred as a consequence of and while Defendant was engaged in the commission of a robbery, and 3) Defendant was the person who actually killed the victim, *or* "[the victim] was killed by a person other than [Defendant] but both [Defendant] and the person who killed [the victim] were principals in the commission of a robbery."  (*emphasis added*).  Thus, even if the jury found that Defendant did not participate in the actual killing, the jury could still have found Defendant guilty of first-degree felony murder.  There is therefore no reasonable probability that Defendant's alleged testimony, in which he would have admitted participating in some aspects of the offense but not the actual killing, would have had any difference in the outcome of the trial.  Defendant's claim is therefore denied.

(Doc. 10, Ex. 10, pp. 230-32) (court's record citations omitted).

The record supports the finding that Dadabo's decision not to testify was voluntary.

(Doc. 10, Ex. 18, Vol. XIII, pp. 1237-39.)  Additionally, Dadabo has not shown that any

strategic advice by counsel not to testify was unreasonable.  Detective Spoor testified to

his numerous interviews with Dadabo.  Spoor's testimony reflects that during later

interviews, Dadabo changed some details of his stories, provided Spoor with additional

information, and made incriminating statements.  (Doc. 10, Ex. 18, Vol. X, pp. 718-30, 791-

96; Vol. XI, pp. 872-76, 922-25, 982-93.)  Therefore, as the state court noted, Dadabo

would have been subject to thorough cross-examination concerning any inconsistencies

or variations in these interviews.

Additionally, even assuming that Dadabo could establish that counsel misadvised

him that the jury would learn the nature of his prior felony convictions, as addressed by the

state court, Dadabo has failed to demonstrate prejudice.  The charge against Dadabo allowed the jury to find him guilty of first degree murder if he was a principal in the robbery during which Dittus was killed.  The court instructed the jury:

> I will now instruct you on felony murder, which is first degree murder. So first degree felony murder.
> Before you can find the Defendant guilty of first degree felony murder, the State must prove the following three elements beyond a reasonable doubt:
> Number one: Mary Dittus is dead.
> Number two: The death occurred as a consequence of and while Anthony Dadabo was engaged in the commission of a robbery. . . .
> Number three: Anthony Dadabo was the person who actually killed Mary Dittus, or Mary Dittus was killed by a person other than Anthony Dadabo, but both Anthony Dadabo and the person who killed Mary Dittus were principals in the commission of a robbery. . . .
> In order to convict of first degree felony murder, it is not necessary for the State to prove that the Defendant had a premeditated design or intent to kill.

(Doc. 10, Ex. 18, Vol. XIII, pp. 1260-61.)

Florida's felony murder law provides that murder in the first degree includes "[t]he unlawful killing of a human being . . . [w]hen committed by a person engaged in the perpetration of, or in the attempt to perpetrate, any . . . [r]obbery". § 782.04(1)(a)2.d., Fla. Stat.  The law regarding principals provides:

> Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense.

§ 777.011, Fla. Stat.   This statute "eliminates the distinction between those who are actually or constructively present at the commission of the offense. . . . No distinction is made between those who are the brains of the crime and those who are the arms of the

crime." *State v. Reid*, 886 So.2d 265, 266 (Fla. 5th DCA 2004).   "In Florida, the felony

murder rule and the law of principals 'combine to make a felon liable for the acts of his co-

felons.'" *Brison v. State*, 18 So.3d 1075, 1077 (Fla. 2d DCA 2009) (quoting *Bryant v. State*,

412 So.2d 347, 350 (Fla. 1982)).

Therefore, the state court instructed the jury:

> I will now instruct you on principals.  If the Defendant helped another person or persons commit a crime, the Defendant is a principal and must be treated as if he had done all of the things the other person or persons did, if:
> Number one: The Defendant had a conscious intent that the criminal act be done.
> Number two: The Defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually commit the crime.
> To be a principal, the Defendant does not have to be present when the crime is committed.

(Doc. 10, Ex. 18, Vol. XIII, p. 1268.)

The State presented evidence that Dadabo intended that the robbery occur.  He

admitted that he and DiFiore planned to rob Dittus.  (Doc. 10, Ex. XI, p. 988; Ex. XII, pp.

1027-28, 1078-79.)  The State also presented evidence that Dadabo took actions or made

statements that were intended to, and did, incite, cause, encourage, assist or advise

DiFiore to commit robbery.  Dadabo admitted that he told DiFiore the location of a key to

Dittus' home and made the phone call to DiFiore when he was returning from the casino

with Dittus.  (Doc.10, Ex. XI, p. 988; Ex. XII, pp. 1027-28; Ex. XIII, pp. 1166-67.)  The State

also presented evidence to show that a robbery occurred.[8]  Force and violence were used

---

[8] The jury was instructed as follows on robbery:

> Robbery consists of the following elements which must be proven beyond a reasonable doubt:
> Number one: Anthony Dadabo took the money or property from the person or

(continued...)

during the events in which $700 was taken from Dittus.  (Doc. 10, Ex. 18, Vol. XI, pp. 1038-40.)  Dadabo admitted that he and DiFiore used the money to buy drugs.  (*Id.*, p. 1040.)

Accordingly, Dadabo's proposed testimony he was not present for the entirety of the crime or for Dittus' death did not affect his liability for first degree felony murder.  *See Miller v. State*, 409 So.2d 109, 110 (Fla. 3d DCA 1982) ("For purpose of a felony-murder conviction it is irrelevant that appellant was not present at the time of the actual killing.  As a perpetrator of the underlying felony, she is a principal in the homicide.").  Because Dadabo fails to show a reasonable probability that his proposed testimony would have changed the outcome of the proceeding, he has not established that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim.  He is not entitled to relief on Ground Four (C).

**Ground Four (E)**

Dadabo argues that trial counsel was ineffective for misadvising him that he should reject a plea agreement because his incriminating "statements 'would' be suppressed." (Doc. 1, p. 13.)  Dadabo asserts that counsel should have known his motion to suppress would be denied.  The postconviction court denied this claim when Dadabo raised it in his postconviction motion:

---

[8](...continued)
custody of Mary Dittus.
  Number two: Force, violence, assault or putting in fear was used in the course of the taking.
  Number three: The property taken was of some value.
  Number four: The taking was with the intent to permanently or temporarily deprive Mary Dittus of her right to the property or any benefit from it, or appropriate the property of Mary Dittus to his own use, or to the use of any person not entitled to it.

(Doc. 10, Ex. 18, Vol. XIII, pp. 1261-62.)

The Defendant alleges that his decision to reject the State's plea offer was based on misad[v]ice of counsel and that had he been properly advised he would have accepted the plea. The Defendant claims that he offered to enter a plea in exchange for a sentence of 15 years in prison and that the State counter-offered 20 years' imprisonment. The Defendant claims that the plea negotiations occurred before the hearing on his motion to suppress and that counsel told him that his statements/confession to the police would be suppressed based on a violation of the Defendant's Miranda rights. The Defendant claims that he did not reject or accept the 20-year offer; however, he specifically points to the place in the record where he rejected the 20-year offer. The Defendant claims that counsel misadvised him that his statement/confession would be suppressed and that he based his rejection of the plea offer on counsel's representation that without a confession or other evidence, the jury would at most find him guilty of manslaughter, which is punishable by 15 years in prison.

The Defendant further alleges that it is well-settled law that his interrogators were not obligated to furnish him with an attorney because he was not officially in custody at the time of his questioning and counsel should have known this and advised him that his motion to suppress would be unsuccessful. In addition, The Defendant claims that he was not adequately advised of the true nature of the charged offense or the possible range of sentencing.

The record reflects that the motion to suppress was denied and a tape of the Defendant's statements to police was played at trial. The record also refutes the Defendant's claims. On March 25, 2008, the Court held a hearing on the Defendant's motion to dismiss counsel. At the hearing counsel stated that there had been negotiations with the State and explained that he felt the defense had an excellent chance of suppressing the Defendant's statements. He further stated that he had told the Defendant that suppression of his statements did not make the murder case "go away" since there was other evidence, which included circumstantial evidence, and possibly the testimony of the co-defendant. The Defendant told the Court that he understood but wanted to review the discovery before deciding whether to authorize counsel to offer the number of years the State had indicated would be accepted. The hearing on the Defendant's motion to suppress did not occur until April 3, 2009, nearly a year later.

Counsel explained in open court that he believed there was a good chance the motion to suppress would be granted but that the Defendant's case was not solely dependent on the outcome of the motion to suppress. Accordingly, the Defendant cannot now claim that he based his decision to reject the State's plea offer on counsel's representation that the motion to suppress would be granted.

Furthermore, in "Issue Eight" of his motion the Defendant argues and insists that he was in custody during his questioning because the police backed him into the interrogation room and locked him in, blocking his exit,

and denied his requests for counsel after reading him his <u>Miranda</u> warnings. Based on the Defendant's description of his questioning counsel would have reason to believe that the police wrongfully denied the Defendant counsel because he was in custody at the time of questioning.  As to the Defendant's claim that counsel failed to explain the nature of the first degree murder charge or the possible sentence, the record shows that counsel explained the elements and the sentence at a pretrial motion hearing. And, even if counsel had incorrectly advised the Defendant, which he did not, the Court also advised him several times that he was facing life or possibly death on the murder charge.  This claim is denied.

(Doc. 10, Ex. 7, pp. 32-34) (court's record citations omitted).

The record supports the state court's conclusion.   When the parties discussed a potential plea agreement at a pre-trial hearing, counsel stated:

> Judge, I think we reached a number that [the prosecutor] said that he felt that the office would go for.  I presented that to Mr. Dadabo. . . .
> But we have been kind of shooting for this number for a period of time. When Mr. Dadabo said he could live with that, I thought everything was kind of a done deal.  I mean I've represented to Mr. Dadabo - - it was a pretty big investigation in this and there is a statement/confession that he made which, candidly, and I advised him, I believe, that we have an excellent shot of getting that suppressed.
> That just doesn't make the case - - but I told him, that doesn't make the case go away.  There's other circumstantial evidence, and probably more importantly, a codefendant will suddenly, I'm sure, become the star witness against him in the particular case.  I also advised him that if I go forward on these type of things, that normally, any deal negotiations we have will probably go away.

(Doc. 10, Ex. 18, Supp. I, pp. 887-88.)  Dadabo then told the court he wanted more time to review discovery and decide whether to authorize counsel to make an offer to the State.

(*Id.*, pp. 892-93, 897-98.)  At a subsequent hearing, Dadabo indicated he was not willing to serve a twenty-year term, which the State would require in order to reach an agreement:

> [COUNSEL]: Well, I had approached them with a number that Mr. Dadabo said he would accept.  They come back thinking that - - once again, nothing's set in stone here, but we had gone with 15 and they had come back saying, well, we think we could accept 20, get your client's approval.
> I approached Mr. Dadabo with the idea of perhaps resolving this thing

with 20.  Since he had already agreed to 15 and he said no.  That's kind of where it was left at.

THE COURT: All right.  Is that where we're at, Mr. Dadabo?  Is that where we're at?

THE DEFENDANT: Basically, yes, sir.

THE COURT: All right.  So you were willing to accept 15, but not 20?  Is that right?

THE DEFENDANT: [No discernable response.]

THE COURT: Is that right?

THE DEFENDANT: Yes.

(Doc. 10, Ex. 18, Supp. I, p. 917.)  At the same hearing, counsel again stated that there was other evidence against Dadabo even if his confession was suppressed, and that Dadabo's rejection of the plea would be due to his wish for a term of fifteen, not twenty, years:

> [COUNSEL]: [ ] I mean, and I do feel we've got an excellent shot at getting it, you know, suppressed.  There are other statements, other comments to people, while it may not being [sic] as detailed as this, could have an effect.  And I've spoken with - - one thing I just want to know and make sure it's clear that I'm more than happy to go to trial and do everything I possibly can, but as long as we know that we're making this decision based on a difference of five years, that's fine with me because it's him having to do the time and not me, and if he's willing to take the chance, and I've told him what I feel the power of the State's case is, if he's willing to take that chance and roll the dice, that's fine.  I'll do everything I can to win the case, but in reality, we're basically arguing over, what, 40 months with the 85 percent rule,[9] basically.

---

[9] Section  944.275(4)(b)3., Fla. Stat. provides:

For sentences imposed for offenses committed on or after October 1, 1995, the [Department of Corrections] may grant up to 10 days per month of incentive gain-time, except that no prisoner is eligible to earn any type of gain-time in an amount that would cause a sentence to expire, end, or terminate, or that would result in a prisoner's release, prior to serving a minimum of 85 percent of the sentence imposed.

THE COURT: Right.  Now, obviously, he's not legally entitled to only serve 85 percent, but - -

[COUNSEL]: Right.

THE COURT:  - - he is mandated to serve at least 85 percent and then it will be up to the Department of Corrections if he gets the 15 percent good and gain time, which normally does occur, but there's absolutely no guarantee that it would.  It's completely up to the Department of Corrections.

So you are sure, sir, that you want to risk a life sentence over five years, which will turn out to be a lot less if you do get the 15 percent with good and gain time?  Is that what you want to do?

THE DEFENDANT: Yes.

THE COURT: Okay.

[COUNSEL]: That's fine.

(Doc. 10, Ex. 18, Supp. I, pp. 923-24.)  Dadabo does not show that counsel misadvised him not to enter the plea because his statements would be suppressed.[10]  Although counsel thought there was strong likelihood of suppression, there is no indication that counsel advised Dadabo the statements would in fact be excluded.  Additionally, Dadabo was aware that even if the motion to suppress was granted, the State could proceed against him with other evidence. The record shows Dadabo knew of this before deciding to reject the plea agreement.

Dadabo does not show that the state court's rejection of his claim was contrary to or an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts.  He is not entitled to relief on Ground Four (E).

It is therefore

---

[10] The record makes clear that counsel could not wait until the court ruled upon a motion to suppress before advising Dadabo whether to accept the plea offer.  If counsel filed the motion, plea negotiations would cease. (Doc. 10, Ex. 18, Supp. I, pp. 887-90, 920-23.)  This was discussed in Dadabo's presence.

**ORDERED** that Dadabo's petition for writ of habeas corpus (Doc. 1) is **DENIED**.

The Clerk is directed to enter judgment against Dadabo and to close this case.

### CERTIFICATE OF APPEALABILITY AND
### LEAVE TO APPEAL *IN FORMA PAUPERIS* DENIED

It is **ORDERED** that Dadabo is not entitled to a certificate of appealability (COA).

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district

court's denial of his petition.  28 U.S.C. § 2253(c)(1).  Rather, a district court must first

issue a COA.  *Id.*  "A [COA] may issue . . . only if the applicant has made a substantial

showing of the denial of a constitutional right."  *Id.* at § 2253(c)(2).  To make such a

showing, Dadabo "must demonstrate that reasonable jurists would find the district court's

assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S.

274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues

presented were 'adequate to deserve encouragement to proceed further'" *Miller-El v.

Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4

(1983)).  Dadabo has not made the requisite showing in these circumstances.  Finally,

because Dadabo is not entitled to a COA, he is not entitled to appeal *in forma pauperis*.

**ORDERED** at Tampa, Florida, on January 19, 2017.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Anthony Dadabo
Counsel of Record